In the Matter of M.L.B., an alleged deprived child.

STATE of Oklahoma and M.L.B., Appellants,

v.

LUTHER K.B., Appellee.

No. 77907.

Court of Appeals of Oklahoma, Division No. 2.

Dec. 22, 1992.

Robert H. Macy, Dist. Atty., Mary H. Smith, Asst. Dist. Atty., Stephen E. Ferguson, Crabb & Ferguson, Oklahoma City, for appellants.

James L. Percival, Contract Public Defender, Oklahoma City, for appellee.

BRIGHTMIRE, Judge.

The sole issue presented for review is whether or not the trial court erred in prohibiting the state from continuing with proceedings to terminate the parental rights of a long-term imprisoned natural father in and to his ten-month-old child pursuant to the provisions of 10 O.S.1991 § 1130(A)(7).

We hold it did, vacate the order, and remand for further proceedings.

## I

The Oklahoma County Department of Human Services removed ten-month-old M.L.B. from the custody of her parents, Luther and Elizabeth B., and took her into protective custody in December 1987. A show cause hearing was held by a referee on December 21, 1987, who noted hand burns indicating that the child "may have been abused," and committed the baby to the temporary custody of her maternal aunt, Donna Hill.

A juvenile petition filed ten days later alleged that M.L.B. and her two brothers—five-year-old L.B. and two-year-old L.K.B.—were deprived children.[1] The further allegation was that all three children had been physically abused, and specifically that there were first and second degree burns on M.L.B.'s hands. And, finally, the state pleaded that the parents' home was unfit for the children due to severe domestic violence committed by the father.[2]

---

1. A referee held a show cause hearing for the two boys on January 13, 1988. The father, who failed to appear, filed a motion to dismiss which was overruled and the boys were ordered to remain in the custody of DHS and the baby with Hill.

2. A petition for emergency protective services for the mother was filed by the state. The allegations were that she had been severely abused "resulting in a stroke and brain damage" which had left her "paralyzed on the right side"

Eventually the matter came on for a dispositional hearing. The mother—who, herself, on December 31, 1987, had become a ward of the court due to physical disability and suspected mental incompetence secondary to her near fatal strangulation by the father the previous February—stipulated that the allegations of the petition were true. The father declined to stipulate and demanded a jury trial.

Such a trial was held March 18, 1988. The jury returned a verdict finding that all three children were deprived within the meaning of 10 O.S.1991 § 1101(4). Consequently, the court ordered the two boys committed to the custody of DHS for interim placement in a foster home, and placed the baby girl in the care of her maternal aunt pending further disposition.

Periodic review hearings subsequently conducted by the court disclosed that the father had been charged with multiple felonies stemming from his earlier violent and disabling attack on the mother. The court rejected the paternal grandmother as an appropriate placement alternative and ordered the father to undergo psychological testing and examination in an effort to determine whether he could ever become a safe parent for the children.

The father was subsequently convicted of battering with intent to kill the mother and on August 1, 1989, was sentenced to one hundred years in the penitentiary for the crime.[3] A month later the state filed an amended petition asking the court to terminate the father's parental rights as a consequence of his extended incarceration pursuant to the provisions of 10 O.S.1991 § 1130(A)(7).[4] The father objected.

At a hearing on June 17, 1991, the trial court ruled that the state could continue with proceedings to terminate the father's parental rights in the two boys who had been placed in a foster home but that a § 1130(A)(7) termination would not lie as to the baby girl because she had been placed in the home of an "extended family member."

The state appeals contending that the trial court's construction and application of § 1130(A)(7)(b) is erroneous.

## II

■ The controversy centers on the legal consequences of the court's interim placement of its ward, the baby girl, in the care of her maternal aunt and generates this question: Did the aunt have "custody" of the baby girl within the intent and meaning

along with inhibited "speech and motor coordination and thought processing."

**3.** The mother, who had been in a nursing home for some time and had divorced the father, was still under the guardianship of DHS. The August 1, 1989, judgment and sentence states that the father was convicted of "assault and battery by means of force likely to produce death, after former conviction of two (2) or more felonies."

**4.** The relevant provisions of 10 O.S.1991 § 1130, read:

"A. The finding that a child is delinquent, in need of supervision or deprived shall not deprive the parents of the child of their parental rights, but a court may terminate the rights of a parent to a child in the following situations:

\*　　\*　　\*　　\*　　\*　　\*

7. A finding that all of the following exist:
　a. the child is deprived, as defined in this chapter, and
　b. *custody of the child has been placed outside the home of a natural or adoptive parent, guardian or extended family member,* and

　c. the parent whose rights are sought to be terminated has been sentenced to a period of incarceration of not less than ten (10) years, and
　d. the continuation of parental rights would result in harm to the child based on consideration of the following factors, among others: the duration of incarceration and its detrimental effect on the parent/child relationship; any previous incarcerations; any history of criminal behavior, including crimes against children; the age of the child; the evidence of abuse or neglect of the child or siblings of the child by the parent; and the current relationship between the parent and the child and the manner in which the parent has exercised parental rights and duties in the past, and
　e. termination of parental rights is in the best interest of the child.
Provided, that the incarceration of a parent shall not in and of itself be sufficient to deprive a parent of his parental rights[.]" (Emphasis added.)

of that term as used in § 1130(A)(7)(b), so that the court was without authority to terminate the father's parental rights in the baby girl?

We hold she did not. At the outset it is significant to note that the trial judge had no trouble finding that all the criteria required by § 1130(A)(7) for terminating the father's parental rights existed with respect to the two boys. But then, with regard to their baby sister, the court held that one criterion, subsection (b), did not exist because of the fact it had earlier ordered the boys' baby sister placed with her aunt, an "extended family member," and therefore it had to find that "custody" of the child had *not* been placed outside the home of a natural or adoptive parent, guardian or "extended family member," thus precluding termination of the father's parental rights.

■ "Custody," as that term is ordinarily used:

"[E]mbraces the sum of parental rights with respect to the rearing of a child, including its care. It includes the right to the child's services and earnings ... and the right to direct his activities and make decisions regarding his care and control, education, health, and religion.... Thus it is common practice in divorce cases for the court to award 'legal custody' to one or both parents and 'physical custody' to one parent with or without the right of visitation by the other parent, or physical custody may even be awarded to a third person, usually a relative."

*Burge v. City and County of San Francisco,* 41 Cal.2d 608, 262 P.2d 6, 12 (1953).

■ We agree with the state's thesis that the maternal aunt did not have "custody" of the baby girl within the meaning of that term as used in § 1130(A)(7)(b); that the custody referred to in subsection (b) is "legal custody" as distinguished from interim physical placement of a court's ward. Consequently, the argument is, the temporary placement of the baby with the maternal aunt did not divest the court of its status as legal custodian and, thus, custody of the child had been placed outside the

home of an extended family member. The father, of course, disagrees.

■ Before discussing the merits further it would be helpful to review certain fundamental rules of statutory construction. First of all the goal is to determine and follow legislative intent which is presumed to be expressed in the statute. *Darnell v. Chrysler Corp.,* 687 P.2d 132 (Okl.1984). At the same time, if the intent is not clear, the statute should be given a sensible construction in keeping with the evils intended to be corrected or with the remedy afforded. *AMF Tubescope Co. v. Hatchel,* 547 P.2d 374 (Okl.1976). The same case also stresses that the legislature will not be presumed to have intended an absurd result by the enactment, and its various provisions will be construed in such a manner as to reconcile them, if possible, "and render them consistent and harmonious and give intelligent effect to each." *Id.* at 380 (quoting *Eason Oil Co. v. Corporation Comm'n,* 535 P.2d 283, 286 (Okl. 1975)).

Returning now to the merits, it is obvious that subsection (b) in subject act is ambiguous when it is considered in the context of the other four criteria. Indeed, each of the criteria required to be found, except subsection (b), clearly relates to parental conduct or status which has some bearing on the best interest of the child. In order for the same thing to be true of subsection (b), the "custody" placement it refers to would have to pertain to parental conduct rather than familial situs or status and such conduct would have to be by a parent who is or is about to be incarcerated, namely, the act of placing physical custody of his child outside the home of, among others, "an extended family member."

If, however, this is all the statutory provision means or amounts to we would have to assume the legislature required a finding which was immaterial to the issue of whether the father's parental rights should be terminated. For instance, the imprisoned parent could have left the child in the family home under detrimental conditions and, under a strict interpretation of

§ 1130(A)(7)(b), the trial court could not terminate the felon's parental rights. But if the felon concluded that no appropriate home environment was available and found and arranged for suitable child care outside the family home his rights could be terminated if other fact findings warranted. Such a construction, it seems to us, would border on the absurd.

For these reasons, we hold that "custody," as used in § 1130(A)(7)(b), means the legal authority to make fundamental decisions about a child's welfare—including its placement. This interpretation of subsection (b) harmonizes with the overall intent and purpose of the statute.

As applied to the facts in this case all three children became wards of the court within the contemplation of subsection (b) when they were taken into protective custody after their father strangled and disabled their mother. Pending an order of the court, DHS provided temporary custodial care—custody which was outside the home of a parent or relative. And, as we pointed out earlier, the baby remained a ward of the court even after her transient placement in the home of the maternal aunt. Therefore, since legal custody of the baby remained in the court it was error to find that custody of the baby had not been placed outside of the parental or familial home prior to the time the petition to terminate was heard.

### III

For these reasons we hold it was error to order dismissal of the state's petition to terminate the defending father's parental rights in and to M.L.B.

The order is therefore vacated and the cause is remanded for further proceedings.

Order vacated and cause remanded.

RAPP, P.J., and REIF, J., concur.